Filed 5/12/26  P. v. Shaw CA6

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

TERRANCE SHAW,

    Defendant and Appellant.

</td><td>

H051527
(Monterey County
Super. Ct. No. 22CR004787)

</td></tr>
</table>

In August 2023, a jury convicted defendant Terrance Shaw, an inmate at the Monterey County Jail (jail) of various offenses arising out of his assaulting two other inmates, Martin S. and Michael A.[1] In a bifurcated proceeding, the trial court found true the allegations that Shaw had four prior convictions that constituted both strikes and serious felony enhancements.  Shaw was sentenced to an aggregate term of two years, consecutive to any other sentence.

On appeal, Shaw argues that the trial court erred by excluding expert testimony regarding violence in custodial settings and by excluding his own testimony describing his exposure to violence during his incarceration.  He also argues that the trial court erred by imposing a $600 restitution fund fine instead of the statutory minimum of $300.

As we explain below, we reject Shaw's arguments in their entirety and will affirm the judgment.

---

[1] We refer to the victims and witnesses, other than police officers and expert witnesses, by their first names and last initials to protect their privacy interests.  (Cal. Rules of Court, rules 8.90(b)(4), (10), (11).)

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural background

On August 21, 2023, the Monterey County District Attorney filed an amended information charging Shaw with two counts of assault by means likely to produce great bodily injury (Pen. Code,[2] § 245, subd. (a)(4); count 1 [Martin S.], count 3 [Michael A.]); and two counts of battery with serious bodily injury (§ 243, subd. (d); count 2 [Martin S.], count 4 [Michael A.]).

As to counts 1 and 3, the amended information alleged that Shaw personally inflicted great bodily injury on the victims within the meaning of section 12022.7, subdivision (a) and, as to counts 2 and 4, that he personally inflicted great bodily injury within the meaning of section 969f, subdivision (a).  The amended information further alleged, as to all four counts, that Shaw had four prior strike convictions (§ 1170.12, subd. (c)(2)(A)) and four prior serious felony convictions (§ 667, subd. (a)(1)).

On August 28, 2023, the jury found Shaw guilty of counts 3 and 4 [Michael A.] but found not true the great bodily injury enhancements alleged as to those offenses.  The jury acquitted Shaw on counts 1 and 2 [Martin S.] but found him guilty of the lesser included offenses of simple assault (§ 240, count 1) and simple battery (§ 242, count 2).  As to counts 1 and 2, the jury also found not true the great bodily injury enhancement allegations under sections 969f, subdivision (a) and 12022.7, subdivision (a).

In a bifurcated proceeding that same day, the trial court found true the allegations that Shaw suffered four prior strike convictions (§ 1170.12, subd. (c)) and four prior serious felony convictions (§ 667, subd. (a)(1)).

On October 24, 2023, the trial court denied Shaw's *Romero*[3] motion and his motion to reduce his convictions on counts 3 and 4 to misdemeanors (§ 17, subd. (b)).  The trial court then sentenced Shaw to an aggregate term of two years, consisting of a term of one year (one-third the middle term) on count 3, doubled pursuant to section 1170.12 and consecutive to any other sentence.  The court imposed, and stayed pursuant to section 654, an identical sentence on count 4.  On count 1, the trial court ordered Shaw to serve 90 days in any penal institution.  The court made an identical order on

---

[2] Unspecified statutory references are to the Penal Code.

[3] *People v. Superior Court (Romero)* 13 Cal.4th 497.

count 2 but stayed that term pursuant to section 654. The court awarded zero credits as the sentence is consecutive to another sentence.

The trial court imposed a restitution fund fine of $600 (§ 1202.4, subd. (b)) and imposed, but stayed, a $600 parole revocation restitution fund fine (§ 1202.45). The court also imposed a $160 court operations assessment (§ 1465.8) and a $120 conviction (formerly court facilities) assessment (Gov. Code, § 70373).

Shaw timely appealed.

### B. Factual background

#### 1. Prosecution's case

##### a. April 18, 2022[4] attack on Martin S. (Counts 1 and 2)

On April 18, Shaw attacked Martin S., another inmate housed in the same section of the jail.[5] The previous day, Martin S. was taken from his cell for a couple of hours and, after he was brought back, Shaw "[s]tarted acting weird toward" him. Shaw subsequently told Martin S. that he had to "flush his weapons" when correctional staff "raided the whole" section because Martin S. had gone "on suicide watch."

Shaw told Martin S. that Martin S. had to choose whether to have sex with Shaw or fight him. When Martin S. refused to make a choice, Shaw replied, " 'Well, then, I'll have to make the choice for you.' " Shaw left Martin S.'s cell but returned in a few minutes, saying " 'We're going to fight.' " Martin S. was sitting on his bed and said he would not fight Shaw. Shaw punched Martin S. in the head.

Shaw pushed Martin S. backwards and Martin S. fell against the metal corner of his bed, hitting his spine. Martin S. tried to leave his cell, but Shaw placed him in a chokehold and Martin S. lost consciousness. While Martin S. was unconscious, Shaw kicked him in the groin.[6]

---

[4] All dates are 2022 unless otherwise specified.

[5] Martin S. and Shaw were housed together in what was called "G Pod."

[6] The incident, including the kick to Martin S.'s groin, was captured by security footage, which was played in court and admitted into evidence.

3

After Martin S. regained consciousness, he left his cell, went downstairs, and banged on the door for the deputies. Martin S. had injuries to his nose, his tongue, his lip, and redness on his torso and shoulders, along with scratches and bruises. After the incident, Martin S. experienced severe pain in his spine and a "major headache" that he rated as 10 out of 10 in terms of pain. Photographs of Martin S.'s injuries were shown to the jury and entered into evidence.

Martin S. admitted that in 2014 he threatened an officer[7, 8] and, on another occasion in 2019, threatened to kill his mother. He denied threatening or attacking Shaw. Martin S. did not recall meeting with Amanda Briseno, a mental health worker at the jail, after the incident nor did he recall telling her that he had "been involved in a fight."[9]

Dr. Joseph Cohen testified as an expert in forensic pathology, specifically in asphyxia and hypoxia. Dr. Cohen viewed the security footage of the attack on Martin S. and determined it was likely that Martin S. lost consciousness due to Shaw placing him in a head or neck restraint. The redness in Martin S.'s right eye after the incident was consistent with a severe neck compression, which increased pressure in the blood vessels.

Monterey County Sheriff's Deputy Edgar Caballero was working at the jail on the morning of April 18, when he heard someone pounding on the door from G Pod and calling for a deputy. Caballero entered the corridor and saw Martin S. standing at the door. Martin S. appeared "panicked," and Caballero "saw redness and blood on his face." Caballero took Martin S. to the infirmary. Martin

---

[7] The defense called California Highway Patrol Officer Matthew Babcock who testified that he was involved in Martin S.'s arrest for driving under the influence in 2014 and that Martin S. was "out of control," "screaming," and trying to "head butt" Babcock. Martin S. also told Babcock, " 'Fuck you, n---er, I'll kill you.' " Martin S. testified that he did not recall using that slur toward the officer.

[8] Throughout this opinion, and consistent with the usage at trial and on appeal, we use the term "n-word" when referring to the racial slur that Shaw and defense counsel used at trial and further employ dashes when quoting that word from the record. (See *People v. Ware* (2022) 14 Cal.5th 151, 159, fn. 1.)

[9] Briseno was called out of order by the defense and testified that she spoke to Martin S. on April 19. According to Briseno's notes of that conversation, Martin S. told her he was going to be "rehoused due to a fight he had had the day before." On cross-examination, Briseno said that if she did not use quotation marks in her notes, it would have been her paraphrasing what Martin S. told her.

4

S. kept looking back toward G Pod, telling Caballero, " 'Get me out of here.' " Caballero placed Martin S. in cuffs, as Martin S. continued to "shout[] profanities at Shaw."

Caballero testified that when an inmate is placed on suicide watch, jail staff will remove that inmate from their cell and search it. Sometimes, correctional staff will search other cells on "a case by case" basis. An inmate on suicide watch will only be returned to their cell if they are cleared by psychiatric staff.

### b. April 30 attack on Michael A. (Counts 3 and 4)

Monterey County Sheriff's Deputy Joseph Banuelos III was working in the G Pod of the jail on May 1. According to Banuelos, the G Pod "house[s] sensitive needs or protective custody inmates" and some "enhanced mental health needs." After Banuelos learned of an incident in G Pod involving Shaw and Michael A. that took place on April 30, he notified his sergeant and watched surveillance footage of the incident.[10] Banuelos testified that, in the video, Michael A. is first shown cleaning tables in the common area of G Pod.[11] Michael A. then appears to throw a "pair of clippers," a "razor or a shaver" into Shaw's cell through the food slot tray. Michael A. and Shaw "appear[] to have a conversation," after which Shaw "throws the razor" at Michael A.

The video also shows Michael A. coming from the bathroom and, as he passes another inmate who is sweeping, Michael A. knocks a dustpan onto the ground. Michael A. is then seen walking around, pumping his fists in the air and appearing to draw his finger across his throat, which Banuelos said would be taken as a threat. In the video, Shaw runs out of his cell[12] and appears to strangle Michael A.

In the video, Michael A. lost consciousness, then "twitche[d] a few times, [woke] up, and grab[bed]" some tablets that are available for inmates to use in the common area. Shaw came back

---

[10] The surveillance footage was played in court and admitted into evidence.

[11] Banuelos testified that Michael A. was "out on his rotation" at this time.

[12] Shaw was not supposed to be out of his cell. Banuelos testified that Shaw's cell door was defective in that if it was kicked or pushed in a certain way, he could open it from the inside. However, the door could not be opened from the outside once locked, meaning that Michael A. could not have entered Shaw's cell.

5

down the stairs from his cell, grabbed the tablets from Michael A., and then punched him. Shaw placed the tablets back on the charging station.

Dr. Cohen reviewed the video of Shaw's attack on Michael A. and testified that it shows Shaw placing Michael A. in a "carotid sleeper lock" for over four seconds causing him to gradually lose consciousness. After he lost consciousness, Michael A. began "twitching, like seizure activity, especially at the feet and the lower extremities." Shaw also kicked Michael A. in the back three times before he regained consciousness. Dr. Cohen could not discuss Michael A.'s injuries in detail because Michael A. refused medical treatment so there was no physical examination or medical scans.

### 2. Defense case

#### a. Shaw's testimony

Shaw testified that he had been continuously incarcerated since 1995 and first came to the Monterey County Jail at the beginning of 2021. Shaw had been assigned to G Pod for approximately nine or ten months. Inmates were allowed to leave their cells for three hours a day to spend time in the common area, where he would usually shower or watch television. Once every two weeks, he and other inmates were allowed to go outside the cell block.

#### i. April 18 attack on Martin S.

Shaw met Martin S. one or two weeks prior to April 18. During that time, they "shared commissary," "ate together," "watched the same TV shows … [and] talked a lot." On April 18, Martin S. called Shaw over to his cell and Shaw was at Martin S.'s cell door for about 45 minutes to an hour talking to him. Shaw observed that Martin S. was not wearing socks, shoes, or a shirt and Shaw believed that Martin S. was preparing to fight. Shaw explained that bare feet provided better traction on the slippery floors, and a shirt could be pulled over your head when fighting.

Martin S. told Shaw that he felt the other inmates in G Pod were "acting weird towards him." Shaw talked with Martin S. about how "a couple of guys' cells got searched" after Martin S. left G Pod early that morning.[13] Martin S. told Shaw, " 'I don't know why people think I snitched. I didn't snitch. I just heard some stuff.' "

---

[13] In court, Shaw explained that deputies will conduct these searches and seize contraband when they believe that someone is going on suicide watch to be "manipulative."

Shaw told Martin S. that, if he could not compensate the inmates who lost property due to the searches, Martin S. could fight instead. In court, Shaw denied that he had flushed any weapons during the search or that Martin S. owed him in any way. Shaw said that he "joking[ly]" told Martin S. could repay an inmate who lost property by " 'doing some gay shit.' " Shaw said that he regretted making this statement because Martin S. "started sweating and stuff."

Shaw told Martin S. that if he believed he was in danger, he should not have returned to G Pod. Martin S. was sitting on the edge of his bed and began clenching his fist and rocking "a little bit." Shaw advised Martin S. that if he did not want to repay the inmates, he should tell the deputies he wanted to leave G Pod.

Martin S. asked Shaw to step into his cell because Martin S. "felt everyone was hearing" their conversation. After Shaw entered the cell, Martin S. took a swing at him, grazing his shoulder and face. Shaw punched back and "wrestled [with Martin S.] for a long period of time." They fell to the ground outside the cell and Shaw told Martin S. that it was over, and he should " 'just chill.' " Martin S. continued to struggle "like with all his strength" so Shaw "just held him" in a neck lock. Shaw still believed he was in danger from Martin S. up until the point that Martin S. stopped struggling. Shaw admitted that he kicked Martin S. three times as he lay on the ground because Martin S. attacked him and broke Shaw's glasses. After Martin S. got up, he began calling Shaw names as he went down the stairs and banged on the door.

On cross-examination, Shaw testified that he continued to strangle Martin S. after he stopped struggling because he was not certain that Martin S. was unconscious. Shaw denied that he wanted to kill or even hurt Martin S. but just wanted to "immobilize[]" him by placing him in a "submission hold." When asked why he kicked Martin S. three times as he was unconscious, Shaw said he had "been in positions where … you think a person is down, and they're not, and you have a knife in your back or someone knocks you out." Shaw admitted that he "maybe went a little too far" in this instance.

### ii. April 30 attack on Michael A.

Shaw testified that when Michael A. came into G Pod about a week before April 30, he "seemed like a pretty cool person." Shaw's perception soon changed, starting with when his kosher meal was inadvertently delivered to Michael A. Shaw asked Michael A. for his kosher meal and Michael A.

7

began laughing, saying, " 'Kosher is for Jews,' " and " 'You're a fucking black Jew?' " Michael A. did not give Shaw the kosher meal, and Shaw walked away. Michael A. called Shaw back and apologized, saying, " 'I say things that I sometimes don't mean.' "

Later, Shaw confronted Michael A. about him not cleaning the common area. Michael A. said that he was "not a slave," but Shaw was, so Shaw should "go fucking clean up." When Shaw and the other inmates in his rotation began to clean up, Shaw saw Michael A. make a cutting motion across his throat toward him, which Shaw interpreted as a threat to kill. Michael A. subsequently urinated under the door. For the next two or three days, Michael A. kept making banging sounds "[a]ll night," which made it difficult for Shaw and the other inmates to sleep.

Shaw testified that Michael A. became more aggressive in how he talked, "making comments about weapons he got, slashing, like, 'I'm going to kill people,' 'I'm going to stab someone.' " Michael A. showed "no respect," urinating under doors, throwing trash everywhere, screaming, and turning the television volume to maximum at 6:00 a.m. Michael A. also threatened Shaw saying that he would stab him if he "[caught Shaw] out of [his] cell."

After that threat, Shaw became hypervigilant and even broke the "jail rules" by reporting Michael A. to staff. Shaw explained that being hypervigilant meant being "over [] aware of your surroundings" "[b]ecause jail, prison is very [] unpredictable." Shaw testified that he reported Michael A.'s threat because he "was taught to do everything possible before you resort to any type of physical altercation." According to Shaw, staff told him that regular deputies could not relocate an inmate and "everything was up to classification." Shaw also submitted a grievance using one of the tablets and indicated that he had reason to fear Michael A.[14]

Shaw testified that the door to his cell, like other cell doors in G Pod, was faulty in that it could be opened even when it was locked. According to Shaw, one could either push the door at the top from the inside or pull on it from the outside and it would open.

On the morning of April 30, Shaw said that Michael A. had been "scream[ing] all night" and Shaw "jolted aw[a]ke" when Michael A. slammed Shaw's tray port. Shaw narrated the surveillance

---

[14] The reporter's transcript reflects that Shaw was asked if he "expressed [his] fears regarding [Martin S.]" in his grievance. Defense counsel's examination both before and after this single question was about Shaw's interactions with Michael A., however.

footage, saying that it showed Michael A. ascending the stairs toward Shaw's cell. Shaw said that Michael A. was asking Shaw if he was "ready" and to "come out" of his cell. Michael A. had wrapped a blanket around his neck and his body, which Shaw interpreted as Michael A. preparing to get into a fight. Michael A. asked Shaw, " 'Are you going to come out? Are you ready, or I'll come in.' "

As Shaw approached his cell door, Michael A. "flicked hair – face shavers" into Shaw's cell. Shaw had not asked for those items, so he told Michael A. to "get the fuck away from" his door and threw the shavers at Michael A. Shaw knew that Michael A. could open his cell door and, if Michael A. had a weapon, "something is going to happen."

Shaw exited his cell, chased Michael A. "down the stairs, put him in a rear naked chokehold, and then [] kicked him." Shaw testified that he did this because he was frustrated and fearful and hoped that Michael A. would decide not to "sneak attack[]" Shaw. Shaw said that Michael A. was considered "very unpredictable." Shaw testified that he would not get into a fight with someone on the upper tier because you could get thrown off or pushed down the stairs.

Shaw started to return to his cell when another inmate told him that Michael A. had taken some tablets and was going to break them. Shaw told Michael A. to put the tablets back or give them to him. Shaw threw a punch at Michael A. because "he still was talking crazy" though he had not made any threats to Shaw at that point.

Michael A. told Shaw he was going to get his shank and walked to the trash can. Shaw replied, " 'If you want to shank me, well, shank me.' " Michael A. went to the trash can and reached into it. Shaw testified that Michael A. "appeared to be retrieving a shank" but Shaw "was just like whatever." In the video, Shaw testified that he is shown trying to close the door to Michael A.'s cell "to just alleviate everything" so that Shaw could talk to correctional staff. Michael A. kicked the door open, and Shaw felt he had to defend himself. A few seconds later, Shaw went back into his cell, though he did not believe the danger had passed. The next day, Shaw reported the incident to jail staff, asked them to move Michael A., and told them to review the surveillance video.

Shaw described how he placed Michael A. in a headlock and kicked him because he was "pretty fearful" that Michael A. might attack him at some point when Shaw was "unaware." Michael A. had said he had a weapon and, when Michael A. went downstairs, Shaw believed that was because Michael

9

A. wanted to fight him.  Shaw denied that he wanted to hurt or kill Michael A. but placed him in a "submission hold" to "immobilize[]" him.

Shaw testified that he also felt threatened because Michael A. had previously "directed the 'N' word" at him and Shaw understood that slur was historically "connected to violence."

Shaw admitted he had several prior felony convictions, including a conviction for stalking in 2010, two counts of assault in 2013, one count of assault likely to produce great bodily injury in 2021,[15] one count of shooting into an inhabited dwelling, and two counts of assault with a firearm.

### b. Dr. Jay Pennock's testimony

Dr. Pennock testified as an expert in emergency medicine.  In preparation for his testimony, Dr. Pennock reviewed the videos of the two incidents, Dr. Cohen's notes, the victims' medical records and photographs, along with notes from the custodial officers.

Dr. Pennock testified that a loss of consciousness can lead to serious, lasting health conditions, but does not always cause "long-term effects or issues."  Defense counsel played a portion of the video of Shaw's attack on Michael A. in court, and Dr. Pennock testified that Michael A.'s "[t]witching can be seen after any form of head injury … or … loss of consciousness."  After Michael A. regained consciousness, it did not appear that he suffered "significant issues."  Michael A. was walking around with "the same kind of swaggering walk," was able to eat and swallow without difficulty, and displayed a "good range of motion of his neck."  Dr. Pennock reviewed Michael A.'s medical records and testified that nothing in them indicated that Michael A. experienced any "lingering issues" from losing consciousness.  Michael A. was not offered or provided any pain medication.[16]

After viewing the video of Shaw's attack on Martin S., Dr. Pennock testified that Shaw's placing Martin S. in a headlock could cause "substantial damage."  Based on his review of Martin S.'s

---

[15] Shaw admitted he committed this offense against another inmate while incarcerated in Monterey County Jail.

[16] Monterey County Sheriff's Deputy Juan Lopez was called by the defense and testified that he transported Michael A. (misidentified in the reporter's transcript as M.E.) to Natividad Medical Center for treatment.  When Lopez went to Michael A.'s cell, Michael A. was naked in the corner and refused to come out.  Lopez and another deputy escorted Michael A. from his cell, dressed him, and took him to the hospital.  Michael A. did not resist but did not actively cooperate.  Michael A. was at the hospital for two to three hours but refused treatment.  When Michael A. was returned to the jail, he was housed in B Pod instead of G Pod.

medical records, which indicated that Martin S. was treated with "ibuprofen and an ice pack," Dr. Pennock opined that Martin S. did not experience significant injuries in the attack.

On cross-examination, Dr. Pennock acknowledged that Martin S.'s medical records indicated that he had a "one-minute seizure approximately four to six hours" after the incident, but Dr. Pennock noted that the records did not indicate "who saw [the seizure] or who recorded it." Dr. Pennock testified that it is "fairly common to have a seizure" after losing consciousness but seizures are not "in themselves significant or dangerous if they're short."

## II.    DISCUSSION

### A. Exclusion of expert testimony

Shaw argues that the trial court erred in precluding his expert witness, Joseph Hayes, to testify about violence in custodial settings and how exposure to that violence develops into hypervigilance in inmates. The Attorney General contends that the court did not abuse its discretion by not allowing Hayes to testify because that testimony was not relevant and, further, it was properly excluded under Evidence Code section 352. Alternatively, the Attorney General asserts that any error in excluding the testimony was harmless.

We agree that the trial court did not abuse its discretion in excluding Hayes's testimony. To the extent that testimony was at all relevant, its relevance was substantially outweighed by the likelihood that its admission would confuse the issues and mislead the jury. Further, even assuming the trial court erred, Shaw was not prejudiced.

#### 1. Additional background

Before trial, Shaw brought an in limine motion to allow Hayes to offer expert testimony "on self-defense in an institutional setting." According to Shaw's motion, Hayes had been incarcerated for more than 25 years in seven different prisons and "was stabbed, beaten, and witnessed fights occurring once or twice a week." Hayes's testimony would explain how inmates "can become hypervigilant once they have suffered or witnessed violence, and that the inmate's mindset became one of constant readiness for physical assault, with the expectation that any assault could be fatal." Hayes had reviewed the videos of the incidents involving Martin S. and Michael A. and would testify that using a chokehold is often " 'the lesser of two evils.' "

11

In his motions in limine, the prosecutor moved to exclude Hayes's testimony, arguing that it was not relevant to Shaw's belief that he had to defend himself from the victims and was "inadmissible pursuant to Evidence Code sections 350, 351, and 352."

Before trial, the court tentatively granted the prosecution's motion to exclude Hayes's testimony as it was not clear from the trial briefs and offers of proof that it was relevant. The court indicated that it was open to revisiting its ruling during trial, however.

At trial, during a break in Shaw's testimony, defense counsel renewed his request to call Hayes as an expert witness. Counsel informed the court that it would not ask Hayes to opine on the videos of the two assaults but would limit his testimony to violence in custody and how it leads to hypervigilance among inmates. The prosecution countered Hayes's testimony was not relevant and permitting it "would be an attempt to manufacture a new legal standard for what self-defense is in a jail setting, based on his [i.e., Hayes's] personal experiences in jail."

The court affirmed its original ruling, noting that "self-defense is an issue for the jury to decide" and that there was nothing in the jury instructions on self-defense "which would set up a defense of a situational awareness … regarding being in a custodial setting." Further, the court explained that "what [] Hayes felt or experienced at some time in some other facilities over some unknown period of time" is of "minimal relevance." In the court's view, the proffered testimony was "outside the appropriate purview of self-defense, and under [Evidence Code section] 352 … it would be confusing and misleading to the jury."

### 2. *Applicable legal principles*

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is "evidence … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A court has broad discretion under Evidence Code section 352 to exclude relevant evidence if it determines the probative value is substantially outweighed by its possible prejudicial effects. (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*), citing *People v. Clark* (2011) 52 Cal.4th 856, 893.)

We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) "We will not reverse a court's ruling on such matters unless it is

shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Merriman, supra*, 60 Cal.4th at p. 74, quoting *People v. Brown* (2003) 31 Cal.4th 518, 534.) Generally, the application of ordinary rules of evidence does not implicate the federal Constitution; accordingly, we review allegations of error under the "reasonable probabilit[y]" standard of *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*), unless the erroneous admission of evidence affects the fundamental fairness of the trial, in which case the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) would apply. (*People v. Marks* (2003) 31 Cal.4th 197, 227.)

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, subd. (a).)' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.)

" 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

"To justify an act of self-defense … the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him. The threat of bodily injury must be imminent, and '… any right of self-defense is limited to the use of such force as is reasonable under the circumstances.' " (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065 (*Minifie*), citations omitted.) Reasonableness is determined from the point of view of a reasonable person in the defendant's position; the jury must consider all the facts and circumstances it might expect to operate on the defendant's mind. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083 (*Humphrey*); CALCRIM No. 3470.) Under the objective standard, "[t]he issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger. The issue is whether a 'reasonable person' in

defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm." (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 519.)

### 3. Analysis

#### i. Relevance

Here, the trial court did not abuse its discretion in excluding Hayes's testimony as being irrelevant to Shaw's claim that he attacked Martin S. and Micheal A. in self-defense. While Hayes had spent more than 25 years in various custodial facilities, there is nothing in the record to show that he was incarcerated at any time in the Monterey County Jail, nor was there any showing that his experiences in other facilities were similar to the experiences of inmates at the jail.

Shaw's reliance on *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 (*Sotelo-Urena*) and *Humphrey*, *supra*, 13 Cal.4th 1073 is unavailing as those cases are distinguishable.

The defendant in *Sotelo-Urena* was homeless and, after stabbing another homeless man to death, informed police that the victim had stabbed him a few weeks beforehand. (*Sotelo-Urena*, *supra*, at p. 745.) On appeal, the court reversed the trial court's order excluding expert testimony on the "heightened sensitivity to violence experienced by the chronic homeless" finding that such "testimony on chronic homelessness was relevant to the issue of defendant's actual belief in the need to use lethal force to defend himself." (*Id.* at p. 750.) In this case, however, there was no evidence that either of the victims had previously attacked or even threatened to attack Shaw.

In *Humphrey*, the defendant shot and killed her husband, who had been physically abusing her. (*Humphrey*, *supra*, 13 Cal.4th at p. 1080.)[17] The night before the killing, the husband shot at the defendant, narrowly missing her. (*Ibid*.) The next day, the husband hit the defendant, told her " 'This time, bitch, when I shoot at you, I won't miss' " before reaching for his .357 magnum revolver. (*Ibid*.) The defendant was able to grab the weapon first and when the husband reached toward her hand, she fired. (*Ibid*.) The California Supreme Court reversed defendant's conviction, finding the trial court

---

[17] *Humphrey* is further distinguishable in that it involved Evidence Code section 1107 which expressly authorizes the admission of expert testimony "regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence" in criminal proceedings. (*Id.* at subd. (a); *Humphrey*, *supra*, 13 Cal.4th at p. 1076.) There is no equivalent statute authorizing the admission of expert testimony on custodial violence and its effects on inmates.

14

erred by instructing the jury that it could consider expert testimony on battered women's syndrome "in deciding whether the defendant actually believed it was necessary to kill in self-defense, but not in deciding whether that belief was reasonable." (*Id*. at p. 1076.) The Supreme Court determined that expert testimony could assist the jury in understanding that, "[a]s violence increases over time, and threats gain credibility, a battered person might become sensitized and *thus able reasonably to discern when danger is real and when it is not*." (*Id*. at p. 1086, italics added.) Again, in this case, there was no evidence that Shaw had been subjected to specific acts violence committed by either of his victims, or that his exposure to violence *in general* made it more likely that he could "reasonably [] discern when danger is real and when it is not." (*Ibid*.)

Hayes's testimony did not seek to show that exposure to violence caused inmates to become better attuned to genuine threats, but rather, would have shown that such exposure made inmates constantly see threats *everywhere* and conditioned them to strike first. A letter from the defense investigator summarizing his interview with Hayes quotes him as follows: "Hayes noted that in jail or prison, and with a hypervigilant mindset, 'If you feel someone is a threat, *it's better to get off first and ask for forgiveness later…attack and, afterwards, you can sort it out*.' " (Italics added.)

### ii. Evidence Code section 352

Even assuming Hayes's testimony had some relevance to Shaw's claim of self-defense, the trial court did not abuse its discretion in excluding it under Evidence Code section 352 because it would confuse the issues and mislead the jury. Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Hayes's testimony would have described his personal experiences at various other correctional facilities, but not the Monterey County Jail. According to Hayes's interview with the defense investigator, he had been incarcerated in "San Quentin, High Desert (twice), Folsom, Salinas Valley (twice), New Delano, Pelican Bay, and Folsom [*sic*]."[18] However, Shaw made no offer of proof that

---

[18] Hayes also indicated he had, as a juvenile offender, "served various terms in juvenile hall and at the county's Harold Holden Ranch for Boys."

inmates at any of these facilities would have similar experiences to those at Monterey County Jail. A trial court could reasonably conclude that a jury confronted with Hayes's testimony about witnessing "constant violence" including two murders, weekly fights, and semiannual riots, as well as his personally being stabbed and sliced, would divert its attention away from the ultimate question before them in this case, i.e. whether Shaw acted in self-defense when he attacked and choked the two victims. Accordingly, the trial court did not abuse its discretion in excluding this expert testimony.

### iii. Any error was harmless

Finally, even assuming the trial court erred in excluding Hayes's testimony, that error was harmless.

To show reversible error under state law, Shaw must show a reasonable probability of obtaining a more favorable result at trial if the evidence had not been excluded. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Shaw also asserts that the error deprived him of a fair trial and thus we should examine prejudice under the stricter federal standard set forth in *Chapman*, *supra*, 386 U.S. 18. We do not find any violation of the U.S. Constitution, and thus we apply *Watson*. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test"].) Under *Watson*, the burden falls on Shaw to show a reasonable probability that, absent the error, he would have achieved a more favorable result at trial. (*Watson, supra*, at p. 836.) Given the weight of the other evidence establishing Shaw's culpability, as discussed below, no such reasonable probability has been shown.

We first note that Shaw was able to testify about his "hypervigilant mindset," his lengthy incarceration, and the circumstances that he claimed supported his belief that both victims were prepared to attack him. Shaw testified that he believed Martin S. was going to attack him because he was barefoot, which would provide better traction on the floors, and shirtless, since shirts could be pulled over your head in a fight. As to Michael A., Shaw testified that he was considered "unpredictable" and had already threatened to kill Shaw.

Furthermore, the jury viewed the videos of both assaults and could weigh for themselves the reasonableness of Shaw's actions and determine that, rather than being threatened, Shaw initiated each of the assaults. The video of the attack on Martin S. shows Shaw entering Martin S.'s cell, swinging at

16

him, applying a chokehold, then kicking him in the groin as he lay unconscious. Martin S. also testified about the attack and what led to it. On this record, there is no reasonable probability the jury would have found Shaw not guilty of the assault and battery committed against Martin S. had Hayes's testimony been admitted.

Likewise, the video of the attack on Michael A. shows Shaw attacking him three separate times. Shaw comes out of his cell and runs after Michael A. placing him in a chokehold from behind, banging Michael A.'s head against the stair railing, and after Michael A. passed out, stomping on him three times. Due to the severity of this attack, Michael A. is shown twitching on the floor. After Michael A. regains consciousness, Shaw comes back down the stairs, takes tablets from Michael A., and punches him in the face.

Shaw even described how he was not fearful of Michael A. After Michael A. threatened to stab him, Shaw said he replied, " 'If you want to shank me, well, shank me.' " However, other than describing how Michael A. made a slashing gesture and threatened to kill him, Shaw never states that Michael A. attacked him, and the video never shows any such attack. Again, on this record, there is no reasonable probability that the jury would have found Shaw acted in self-defense against Michael A. had Hayes testified.

We are not persuaded by Shaw's argument that, because the jury convicted him of the lesser included misdemeanors for the Martin S. incident, that "suggests the excluded evidence would have made a difference." The jury was instructed that self-defense was a defense to both the charged counts *and* the lesser included offenses. Consequently, the jury's decision to acquit Shaw of the greater offenses related to his attack on Martin S. and convict him of the lesser included offenses was due to the lack of evidence that Martin S. suffered serious injury in those attacks.[19]

### B. Exclusion of Shaw's testimony about exposure to violence in custody

Shaw also argues that the trial court erred by not allowing him to testify about his exposure to violence while he was confined in both the California Youth Authority (CYA) and California Department of Corrections and Rehabilitation (CDCR). In his view, this testimony was relevant to the

---

[19] As opposed to Michael A. who the jury observed on video twitching on the ground after he was choked to unconsciousness by Shaw.

issue of self-defense as it would explain his "hypervigilant mindset." The Attorney General argues Shaw's testimony on this matter was not relevant to his claim of self-defense, the testimony was properly excluded under Evidence Code section 352, and alternatively, any error in excluding the testimony was harmless.

Again, we agree that the trial court did not abuse its discretion in excluding Shaw's testimony regarding the impact of his exposure to violence while incarcerated. To the extent that testimony was at all relevant, its relevance was substantially outweighed by the likelihood that its admission would confuse the issues and mislead the jury. Further, even assuming the trial court erred, Shaw was not prejudiced.

### 1. Additional background

During his direct testimony, Shaw described his upbringing, including that he obtained his high school diploma while he was housed in the CYA. The trial court sustained the prosecutor's relevance objection to defense counsel's question about Shaw's experiences in CYA. Following a sidebar, Shaw was allowed to testify that he had been in custody for more than 23 years. However, the trial court sustained the prosecutor's relevance objection after defense counsel asked Shaw how he had "spent [his] time in prison over the last 23 years."

Outside the presence of the jury, defense counsel explained that his questioning was "relevant [] in a self-defense setting to inform the jury as to the hypervigilant mindset that [] Shaw would have in the county jail by virtue of those experiences." Defense counsel explained that Shaw's testimony about his experiences in custody would be "educational and important for the jury to know when adjudicating self-defense." The prosecutor reiterated his objection that the testimony was irrelevant and that the matter of self-defense was for the jury to decide.

The court excluded the testimony, acknowledging that it was "somewhat relevant" but that "under [Evidence Code section] 352, the prejudicial impact will outweigh the minimal … value of relevance." The court further noted that, by way of this testimony, Shaw "is attempting to set up his own standard of self-defense … but the law sets forth what the guidelines are for self-defense, and it is not a person's own individual standard."

### 2. Analysis

#### i. Evidence Code section 352

The trial court did not abuse its discretion in excluding Shaw's testimony regarding his experiences while in custody under Evidence Code section 352 because it would confuse the issues and mislead the jury.

Shaw's testimony about his personal experiences and exposure to violence while incarcerated were unrelated to his encounters with Martin S. and Michael A. Again, there was no indication that either of the victims in this case had previously attacked or threatened Shaw, which might support a reasonable belief on his part that they presented a danger to him. A trial court could reasonably conclude that his testimony about seeing and experiencing violence over the 23 years that he spent in custody would distract the jury from its consideration of whether Shaw had "an honest *and reasonable* belief that bodily injury is about to be inflicted on him." (*Minifie*, *supra*, 13 Cal.4th at p. 1064, citations omitted.)

As discussed above, in section A.3.i., Shaw's proposed testimony regarding exposure to violence resulting in "hypervigilance" does not show how inmates thereby become better attuned to *genuine* threats. Instead, it shows how it is *reasonable* for inmates, who are purportedly conditioned to perceive everything as a deadly threat, to strike first. It was reasonable for the trial court to conclude that any probative value would be substantially outweighed by the probability that such testimony would confuse the issues or mislead the jury. Therefore, the trial court did not abuse its discretion in excluding this testimony.

#### iii. Any error was harmless

Finally, even assuming the trial court erred in excluding Shaw's testimony, that error was harmless. As discussed above, we apply the *Watson* standard to evaluate evidentiary errors under state law.

Again, Shaw did testify about his "hypervigilant mindset," his lengthy incarceration, and the specific circumstances that, in his mind, supported his belief that both victims were prepared to attack him. Martin S. was barefoot and shirtless, which Shaw said meant he was prepared to fight. Michael A. was "unpredictable" and had threatened to kill Shaw.

19

This direct testimony was much stronger evidence than any testimony about Shaw's experiences in custody and his exposure to violence. The jury was also able to view the video of Shaw attacking both the victims and gauge whether it was reasonable to Shaw to think either of them presented a danger to him. Based on this record, it is not reasonably probable that Shaw would have obtained a more favorable outcome had the jury been allowed to hear his testimony about how he became hypervigilant due to years of exposure to institutional violence.

## C. Restitution fund fine

Shaw argues the trial court erroneously imposed a $600 restitution fund fine and identical parole revocation fund fine because it "incorrectly believed the minimum restitution fine was $300 per felony count rather than $300 per case." The Attorney General counters that the trial court's statements at the sentencing hearing make clear that, without regard to whether the statutory minimum restitution fund fine was $300, the trial court found that Shaw had the ability to pay a restitution fund fine of $600 and thus declined to reduce the amount. We agree with the Attorney General.

### 1. Additional background

At Shaw's sentencing hearing, the trial court ordered him to pay "a $600 restitution fund fine" as well as an identical parole revocation fund fine, which was suspended pending successful completion of parole. Defense counsel asked that the trial court impose the minimum restitution fine, to which the trial court replied, "I believe I imposed the minimum." The trial court continued, "[R]egardless of that, I do see [Shaw] is young and able—will be able to serve—earn an income in prison. So the Court has made that analysis and will not reduce those fines or fees at this time."[20] When defense counsel asked if that meant that the restitution fund fine was $300, the trial court replied, "$600 restitution."

---

[20] The trial court also imposed a court operations assessment of $160 (§ 1465.8) and a conviction (formerly court facilities) assessment of $120 (Gov. Code, § 70373). Shaw did not ask the trial court to consider his ability to pay those ancillary costs and does not challenge their imposition in this appeal. (See *People v. Kopp* (2025) 19 Cal.5th 1, 30 (*Kopp*) [before imposing ancillary costs pursuant to section 1465.8, subdivision (a)(1) and Government Code section 70373, equal protection principles require trial court to, on defendant's request, consider a defendant's inability to pay].)

### 2. *Applicable legal principles*

Section 1202.4, subdivision (b) requires the court to impose a restitution fine "[i]n every case where a person is convicted of a crime." "In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) [i.e., $300] multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (*Id*. at subd. (b)(2).) "A defendant shall bear the burden of demonstrating the defendant's inability to pay. Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (*Id*. at subd. (d).)

Section 1202.45, subdivision (b) provides that "[i]n every case where a person is convicted of a crime and is subject to either postrelease community supervision … or mandatory supervision …, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional postrelease community supervision revocation restitution fine or mandatory supervision revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. …"

Pursuant to *Kopp*, where a trial court imposes fines exceeding the statutory minimum of $300 under section 1202.4, subdivision (b), and section 1202.45, it must consider the defendant's ability to pay. (*Kopp, supra*, 19 Cal.5th at p. 30.)

### 3. *Analysis*

In this case, the trial court imposed a restitution fund fine of $600, an amount in excess of the statutory minimum of $300. Accordingly, as instructed by *Kopp*, the trial court was required to consider Shaw's ability to pay before imposing that fine. The record is clear that it did so. When defense counsel asked the trial court to "impose the minimum," the trial court indicated that Shaw "is young and able – will be able to [] – earn an income in prison." While perhaps perfunctory, the trial court's finding as to Shaw's ability to pay passed without objection or argument by Shaw's counsel. Because Shaw did not object to the adequacy of this finding, we have no reason here to independently question it.

We also reject Shaw's argument that the trial court calculated the $600 restitution fund fine by improperly including a $300 fine on count 4, which was stayed. There is nothing in the record to support this contention and "[t]he general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) Section 1202.4, subdivision (b)(2) expressly provides that, "[i]n setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) [i.e., $300] *multiplied by the number of years of imprisonment the defendant is ordered to serve*, multiplied by the number of felony counts of which the defendant is convicted." (Italics added.) Shaw was ordered to serve two years in prison on count 3 and therefore a restitution fund fine of $600 ($300 times the two years he was ordered to serve times the number of non-stayed felony convictions, i.e., one) was expressly authorized by section 1202.4, subdivision (b)(2). (See *People v. Sek* (2022) 74 Cal.App.5th 657, 672 [no prejudice where trial court erroneously used minimum restitution fund fine of $300 instead of $200 in effect at time of offenses since $4,500 fine imposed ($300 multiplied by 15-year term but not by two felony convictions) was less than $6,000 fine that would result by multiplying $200 by both 15-year term and two felony convictions)].)

### III.    DISPOSITION

The judgment is affirmed.

_____
WILSON, J.


WE CONCUR:




_____
GROVER, ACTING P. J.




_____
LIE, J.




*People v. Shaw*
H051527